# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of

| | |
|---|---|
| Information associated with e-mail address zackminix1@gmail.com and the subscriber, user name, or account name zakkubyoto that is stored at premises controlled by Snap Inc. | ) ) ) ) ) |

Case No. 20-sw-01315-STV

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe there is now concealed on the following person or property located in the <u>Central District of California and elsewhere</u>:

**SEE "ATTACHMENT A,"** which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal:

**SEE "ATTACHMENT B,"** which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of Title 18, United States Code, Sections 2252(a)(2) & (a)(4), 2252A(a)(2) and (5), 2422(a) and (b), and 2423(a) and the application is based on these facts:

☒ Continued on the attached Affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Christopher Scrabis*
_____
*Applicant's signature*

Special Agent Christopher Scrabis
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
                        ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: October 28, 2020

_____
*Judge's signature*

City and state:   Denver, CO

Scott T. Varholak, U.S. Magistrate Judge
_____
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

This warrant applies to information associated with the SnapChat account(s) associated with subscriber or user name **zakkubyoto** (here and in Attachment B "SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Snap Inc., whose office is located at 2772 Donald Douglas Loop North, Santa Monica, CA 90405, (hereinafter and in Attachment B "PROVIDER").

## ATTACHMENT B

### Particular Things to be Seized

## I. Information to be disclosed by Snap Inc. (PROVIDER)

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap Inc., regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Snap Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Snap Inc. is required to disclose the following information to the government for each account listed in Attachment A for the time period of January 1, 2020 to August 21, 2020:

A. The contents of all communications, "Snaps," "Story" or "Stories," "Chats", emails, messages, and attachments associated with the SUBJECT ACCOUNT, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) messages sent to and from the account, draft messages, existing printouts of any such messages, the source and destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message;

B. All records or other information regarding the identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses, phone numbers, or other identifying information provided during registration, other associated email accounts, all screen and usernames (past and current) associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

C. All transactional information of all activity of the account or identifier described above, including log files, messaging logs, dates and times of connecting, methods of connecting, and IP addresses associated with the outgoing and incoming messages;

D. All records or other information regarding the devices associated with, or used in connection with, the account (including all device identifier information or cooking information, all current and past trusted or authorized devices and computers, and any devices used to access PROVIDER's services) including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit

Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

E.  The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

F.  All records indicating the services available to subscriber of the SUBJECT ACCOUNT;

G.  The services and types of services the SUBJECT ACCOUNT utilized and all records generated by those services;

H.  All records or other information stored by an individual using the account, including communication with any suspected minors for the purpose of sexual exploitation;

I.  All records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, and files;

J.  Identity of other accounts or services sharing the recovery account or telephone number or other two-factor authentication methods used for the SUBJECT ACCOUNT and the services the SUBJECT ACCOUNT used and all records generated by those services;

K.  All information obtained from any cookies, beacons, geotags or pixel tags associated with the SUBJECT ACCOUNT;

L.  All location information associated with the SUBJECT ACCOUNT;

M.  All information about the device or devices used to access or use the SUBJECT ACCOUNT;

2

N. All privacy and account settings;

O. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

P. A list of all of the people that the user follows and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any friends of the user;

Q. A list of all users that the account has "unfollowed" or blocked;

R. All records of searches performed by the account, including all past searches saved by the account;

S. All information about connections between the account and third-party websites and applications;

T. All data and information associated with any profile page, including photographs, "bios," and profile backgrounds and themes;

U. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to PROVIDER (e.g., including, but not limited to, keybag.txt and fileinfolist.txt files); and

V. All records and information regarding locations where the account or devices associated with the account, including all data stored in connection with any location-based services, maps, or other services used.

Snap Inc. is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section II that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) & (a)(4), 2252A(a)(2) and (5), 2422(a) and (b), and 2423(a) (hereinafter "crimes under investigation") involving Zachariah Minix since January 1, 2020, including, for each account identified in Attachment A, information pertaining to the following matters:

3

A. All electronic mail, "Snaps," "Story" or "Stories," "Chats," attachments, messages, and related computer files or information that identify the account creator, user, individuals, or correspondents engaged in the production, receipt, or possession of child pornography, or that identifies the means or methods used regarding such or other violations of the crimes under investigation;

B. All saved "Snaps," "Story" or "Stories," "Chats," or messaging transcripts that reflect an interest in sexual activity of or with minors;

C. Any and all records, documents, visual depictions, and materials pertaining to child pornography, child erotica, an interest in such materials, or pertaining to a sexual interest in children, or sexual activity involving children;

D. Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors;

E. All communications between the SUBJECT ACCOUNT and the person described in the attached Affidavit as Victim 1;

F. Images, correspondence, and other records that help identify the user of the SUBJECT ACCOUNT;

G. Location information associated with the SUBJECT ACCOUNT that is relevant to the crimes under investigation that helps identify the user of the account or events relating to the crimes to determine the chronological and geographic context of account access, use, and events relating to the crimes and to the SUBJECT ACCOUNT owner and the owner's contacts that are evidence of the crimes under investigation;

H. Information about the devices used to access the SUBJECT ACCOUNT that is evidence of or identifies the user of the account or persons involved in the crimes under investigation;

I. Evidence indicating how and when the SUBJECT ACCOUNT was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscriber;

J. Evidence indicating the subscriber's state of mind as it relates to the crimes under investigation;

### III. Definitions and other information

A. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.

B. "Child Pornography" as used herein is defined in 18 U.S.C. § 2256(8). (Any visual depiction, including any photograph, film, video, picture, or computer or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

C. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

D. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not

5

actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## **AFFIDAVIT**

I, Christopher Scrabis, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## **INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent of the Federal Bureau of Investigation and have been since 2016.  I am currently assigned to the Denver FBI Child Exploitation & Human Trafficking Task Force.  As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A.  I also investigate other child exploitation offenses, such as violations of Title 18, United States Code, Sections 2422 and 2423.  As part of my experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, not each and every fact known through this investigation is included in this Affidavit.  I have only set forth facts necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) & (a)(4), 2252A(a)(2) and (5), 2422(a) and (b), and 2423(a) (the "Subject Offenses") are present at the account(s) requested to be searched.

3. This Affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), in support of an application for a warrant to search the account(s) described in Attachment A ("SUBJECT ACCOUNT") and all content found therein, there being probable cause to believe that located in the account(s) described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of the Subject Offenses.

4. The information contained within the Affidavit is based on my training and experience as well as information imparted to me by other law enforcement officers involved in this investigation.

## **RELEVANT STATUTES**

5. This investigation concerns alleged violations of the Subject Offenses relating to material involving the sexual exploitation of minors.

6. Title 18, United States Code, Sections 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing, or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

7. Title 18, United States Code, Section 2422 prohibits a person from knowingly persuading, inducing, enticing, or coercing any individual to travel in interstate or foreign commerce to engage in any sexual activity for which any person can be charged with a criminal offense and prohibits a person from using the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce a child who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense.

8. Title 18, United States Code, Section 2423 prohibits a person from knowingly transporting an individual who has not attained the age of 18 years in interstate or foreign commerce with intent that the individual engage in any sexual activity for which any person can be charged with a criminal offense.

## **DEFINITIONS**

9.  The following definitions apply to this Affidavit and Attachment B to this Affidavit.

10. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

11. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image (see 18 U.S.C. § 2256(5)).

12. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

13. "Hyperlink" refers to an item on a webpage which, when selected, transfers the user directly to another location in a hypertext document or to some other webpage.

14. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are physically located in the same state.

15. In this Affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## **BACKGROUND REGARDING THE INTERNET, EMAIL, AND ONLINE STORAGE ACCOUNTS**

16. I am familiar with the Internet, which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.

17. An individual who wants to use online accounts must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" or "Provider." Once the individual has accessed the Internet, that individual can use online accounts provided by their ISP or they can use the Internet to connect to web-based services. Web-based services provide accounts that may be accessed from any computer that has access to the Internet. In addition, the individual can access websites using web browsers (computer programs that permit users to navigate through pages of information that are stored on remote computers), to view or download content, or make purchases. The Internet may also be used to access e-groups (websites that require users to subscribe, and permit subscribers to post messages, chat electronically, post and transfer files and share information), newsgroups (that permit posting of email messages regarding specific topics) and video conferencing.

18. Internet Service Providers ("ISPs"):

    A.  ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "email address," an email mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password.

    B.  ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), email communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, email that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that email to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," see 18 U.S.C. § 2510(17), and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service."

19. Internet Protocol Address ("IP Address"):

    A.  Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next customer. On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address

that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer. A modem is an electronic device that allows one computer to communicate with another.

20. Through training and experience, I have learned that Providers such as Facebook, Instagram, Snapchat, Discord, Dropbox, Yahoo, Google, Apple and OneDrive, provide a variety of on-line services. Yahoo, Google, Apple, and Microsoft (OneDrive) also provide electronic mail ("email") access, to the general public. Subscribers obtain an account by registering with Provider. During the registration process, Provider asks subscribers to provide basic personal information. Therefore, the computers of Provider are likely to contain stored electronic communications (including retrieved and un-retrieved email for Provider subscribers) and information concerning subscribers and their use of Provider services, such as account access information, email transaction information, and account application information.

## BACKGROUND REGARDING SNAPCHAT

21. Snapchat is headquartered in Santa Monica, California and owns and operates a free access social networking website of the same name that can be accessed at http://www.snapchat.com. Snapchat is an application for sending and receiving "self-destructing" messages, pictures, and videos.

22. A "snap" is a picture or video message taken and shared with other Snapchat users in real time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123. *See* 18 U.S.C. §§ 3127(1) and 2510(12).

23. A user can also type messages, send photos, videos, audio notes, and video notes to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message that he or she wants to keep. The user can clear the message by tapping it again.

24. "Our Stories" is a collection of user-submitted "snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories," a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

25. In addition to photos, videos, "snaps" and stories, "Snapcash" is an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp," the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S.-issued Visa or MasterCard debit card only; using credit cards is not permitted. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly limit but can be upgraded to a $2,500 weekly limit. Users who upgrade have to provide their full name, date of birth, and Social Security number.

26. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

27. Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account, and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

28. Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. Snapchat also collects unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

29. Snapchat has a "Group Stories" feature allowing multiple users to contribute photos and videos to the same "Story," a collection of posts that stay viewable for a limited amount of time. Snapchatters can name their group story and invite other users and "friends" by username to add content. The group Stories will disappear if 24 hours pass without a user adding a new photo or video.

## OTHER RELEVANT BACKGROUND

30. Collectors and distributors of child pornography often use online resources to retrieve, share, and store child pornography. Non-pornographic, seemingly innocuous images of minors are often found in accounts that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images. Further, the online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free but can involve a charge. A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a collector or distributor of child pornography is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files, including child pornography, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service. Such an online storage account is particularly useful to a collector or distributor of child pornography. Such a subscriber can collect, store, view and distribute electronic images, including child pornography, directly from the online service. Consequently, the illegal files have minimal contact with the subscriber's home computer. The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet. Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service. Evidence of an online storage account may take the form of passwords located in encrypted,

archived,[1] or other files on the user's home computer. Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service. This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

31. I know from training and experience that persons trading in, receiving, transporting, distributing, or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation.

32. I know from training and experience that digital evidence is not limited to computers. I have been involved in cases where persons engaged in the type of crime under investigation can access the Internet, display images reflecting their interests or participation in the crime, and communicate with other individuals with the same interests using digital storage devices to include cellular telephones, email devices, and personal digital assistants. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling Internet and digital cellular network access.

33. Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage device and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses.

34. I know from training and experience that the complete contents of online accounts may be important to establishing the actual user who has dominion and control of an online account at a given time. Online accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. So, information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. This helps establish and prove each element of the crime or alternatively, may exclude the innocent from further suspicion. In my training and experience, an online user's account activity, IP log, location information, search history, stored electronic communications, and other data retained by providers, can indicate who has used or controlled an online account or can provide context for the crime under investigation. This can include evidence of motive and intent to commit a crime (e.g., communications about planning crimes) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. Further, account activity, especially when paired with other evidence of the crime, can show how and when the account was accessed or used and may reflect a user's motive or state of mind when doing so. For example, as described herein, Providers log the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Especially when considered in context with other evidence, such information allows investigators to understand the geographic and chronological context of an account's access, use, and events relating to the crime under investigation. Location data also helps with this. Providers allow users to "tag" their location in posts to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the account user or other suspects.

---

[1] Archive files are files which generally contain other files in a compressed format. Thus, Archive files may be thought of as containers containing other files. Archive files are commonly referred to as "zip" or "zipped" files.

35. I know from training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud") or code words (which require entire strings or series of email conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an email or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities, so actual review of the contents of an online account by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence within the account.

36. I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the government to review records produced by a Service Provider and keep only such records as the government finds to be related to the offenses described herein and in Attachment B during a single analysis. I have learned through practical experience that various emails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole. Analysis is content relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually and not in sum. Due to the interrelation and correlation between communication threads and contents of accounts, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. Therefore, to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, and to maintain its admissibility at trial, the government needs to maintain access to all of the resultant data. The completeness and potential of probative value of the online accounts and data must be assessed within the full scope of the investigation. As with all evidence, the government will maintain the contents of the account(s) in its custody and control, without alteration.

## INVESTIGATION AND SUBJECT OF SEARCH WARRANT

37. On or about August 26, 2020, I spoke with Detective Rich Rodriguez of the Commerce City Police Department. Detective Rodriguez advised he initiated a missing juvenile investigation on August 19, 2020, based on a complaint by a person with the initials S.G. ("S.G."), father of Victim 1 (who is a minor).

38. During Detective Rodriguez's investigation, he identified Victim 1 as a 13-year-old female from Colorado who was picked up in a car in Colorado by Zachariah Minix ("Minix"), a 21-year-old male from Tennessee. Minix and Victim 1 met online and communicated through the gaming application Discord and through Snapchat. Minix and his friend, 21-year-old Ethen Harville ("Harville"), drove from Tennessee to Colorado to pick up Victim 1 on or about the night of August 18, 2020. Victim 1 had not previously met Minix in person.

39. On or about August 21, 2020, the Columbia, Kentucky Police Department located Victim 1, Minix, and Harville at a Sleep Inn and Suites located in Columbia, Kentucky, where Minix and Harville were taken into custody and Victim 1 was transported to a local hospital.

40. On or about August 21, 2020, Special Agents Andrew Martin and Kenda Bryant interviewed Minix at the Adair County Jail in Columbia, Kentucky. Minix advised the social media applications he used were Discord and Snapchat. Minix advised his Discord user name was "sin" but he could not recall his user name

for Snapchat.  Minix advised his e-mail address, zackminix1@gmail.com, was linked to his Discord and Snapchat accounts.

41. Minix advised he met Victim 1 online through Discord and used Discord and Snapchat to communicate with Victim 1.  Minix advised Victim 1 stated she was almost 17 years old.

42. Minix advised he and Victim 1 shared nude photographs of each other through Snapchat.  Minix stated he saved some of the nude photographs of Victim 1 on his phone.  Minix advised he and Victim 1 had virtual sex over video chat through Snapchat.

43. Minix advised he received a telephone call from Victim 1's father when Victim 1 was with him in his car.  Victim 1's father told Minix that Victim 1 was 13 years old, but Minix did not believe him.

44. Minix advised he had vaginal sex with Victim 1 twice while they were traveling from Colorado to Tennessee.  The first time was in the back seat of the car at a rest stop in Kansas, and the second time was in the shower of a hotel room in Kentucky.

45. On or about August 26, 2020, a forensic interview of Victim 1 by a Child and Adolescent Forensic Interviewer ("CAFI") was conducted at the FBI Denver Division.

46. Victim 1 advised she met Minix through Discord a few months ago.  Victim 1 advised she primarily communicated with Minix through Discord, Snapchat, and text messages to each other's cellular telephone numbers.  Victim 1 advised she was 13 years old when she first started communicating with Minix, but told Minix she was 16 years old.  Victim 1 advised Minix told her he was 21 years old.

47. Victim 1 advised she told Minix she was almost 14 years old when Minix first met her in person in Colorado before she got into Minix's car.  Victim 1 advised Minix was fine with her age and stated that nobody was going to know.

48. Victim 1 advised Minix would tell her to send him nude photographs and videos of herself.  Victim 1 sent most of the photographs and videos to Minix through Discord and Snapchat.  Victim 1 advised she would video chat with Minix where they would masturbate together.

49. Victim 1 advised Minix's Discord user name was "sin" and his Snapchat user name was "zakkubyoto."

50. Minix had voluntarily provided consent for the Federal Bureau of Investigation to search his Samsung cellular telephone on or about August 21, 2020.  On or about August 31, 2020, I conducted a preliminary search of Minix's Samsung cellular telephone seized during his arrest on or about August 21, 2020.  I learned the following through my search.  Located within the gallery of pictures, I identified an album entitled "Bby g" that contained 112 images and 86 videos.  I identified that the album contained a mix of images and videos of Victim 1's face and approximately 45 images and videos with what appeared to be a young female's naked breasts, vagina, and/or buttocks, with multiple videos showing a close-up of the female putting her own fingers inside of her vagina.  Based on my training and experience, as well as my knowledge of this investigation, it appeared the Bby g album contained images and videos of Victim 1.

51. On or about September 1, 2020, I served a Request for Preservation of Records letters to Snapchat for account "zakkubyoto" and to Discord for account "sin."  I know from my training and experience that Discord and Snapchat will preserve available records associated with the indicated accounts for approximately 90 days.

52. On or about September 11, 2020, I served subpoena number 632578 on Discord Inc., via e-mail to lawenforcement@discord.com, for subscriber information related to e-mail address zackminix1@gmail.com and user name "sin".  On or about September 25, 2020, I received a response from Discord Inc. to subpoena number 632578.  The Discord account information associated with the verified e-mail address of zackminix1@gmail.com, includes User ID 271003752809365523, and Username Sin#371.

53. Based on my training and experience, I believe Zachariah Minix, using the Snapchat user name "zakkubyoto" and Discord user name "Sin#371":

   A. Received and possessed child pornography from Victim 1 and caused the production of child pornography by requesting nude photographs and videos of Victim 1.

   B. Used a facility in interstate commerce (the Internet) to persuade, induce, entice, or coerce Victim 1 to engage in sexual activity for which any person can be charged with a criminal offense.

   C. Transported Victim 1 in interstate commerce with intent that Victim 1 engage in sexual activity for which any person can be charged with a criminal offense.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

54. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the Provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

55. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on the Provider.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

56. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

57. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, relating to material involving the sexual exploitation of a minor may be located within the account(s) described in Attachment A.

58. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_s/Christopher Scrabis_
Christopher Scrabis
Special Agent
FBI

Submitted, attested to, and acknowledged before me by reliable electronic means on this 28th day of October, 2020.

BY THE COURT:

SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

Application for search warrant was reviewed and is submitted by Emily Treaster, Assistant United States Attorney.